IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| STERLING ESTATES (DELAWARE), LLC, | ) | Bankruptcy No. 10 B 22319 |
| | ) | |
| Debtor. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL ON
DEBTOR'S MOTION FOR USE OF CASH COLLATERAL [Docket No. 11],
ORIX'S MOTION FOR VALUATION OF PROPERTY [Docket No. 68], AND
ORIX'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY [Docket No. 69]**

Debtor owns and operates a manufactured home community, a park consisting of pre-manufactured homes placed on individual sites or "pads" that are leased out to customers. On May 17, 2010, it filed for bankruptcy under Chapter 11. Debtor was indebted under a promissory note (the "Note") held by Banc of America Commercial Mortgage Inc., Commercial Mortgage Pass-Through Certificates, Series 2003-2 (the "Trust"). Wells Fargo Bank, N.A., is the trustee for the registered holders of the Trust (the "Trustee"). ORIX Capital Markets, LLC, ("ORIX") asserts authority to litigate the pending contested matters as Special Servicer, asserted to be a representative of the Trustee. The Note matured on May 1, 2010, and is secured by a lien on substantially all of Debtor's property, including Debtor's real estate, rents, a master lease, and a management agreement.

Trial has concluded on (1) Debtor's Motion for Use of Cash Collateral and ORIX's Objection thereto, (2) ORIX's Motion for Relief from Stay, and (3) ORIX's Motion to Value Property. Final argument was presented in writing by the parties.

Subject matter jurisdiction lies under 28 U.S.C. § 1334. It is before the Court pursuant to 28 U.S.C. § 157 and is referred here by District Court Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. §§1408 and 1409(a). This Adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (G) and (M).

## I. ORIX HAS STANDING TO CONTEST THESE MATTERS

In a case dealing only with a Motion to Modify Stay, the issue as to standing rarely arises. Under *In re Vitreous Steel Products Co.*, 911 F.2d 1223 (7th Cir. 1990), issues to be decided on a motion to modify the automatic stay generally do not require a search into a history of the loan. However, under the rule that a movant to modify stay must at least show a "colorable claim," (*id.* at 1232) it is possible that need to show a "colorable claim" can require some explanation of how a mortgage in favor of X can be pursued by Y unless assignment or existence of agency relationship is shown in some way. That issue is presented here.

At trial and in its post-trial Proposed Findings of Fact and Conclusions of Law, Debtor challenged ORIX's standing to contest each of the three matters tried. Throughout the case, ORIX has presented itself as a special servicer with authorization to bring suits on behalf of the Trust. The first issue to be decided is Debtor's challenge to whether ORIX has shown that it is the authorized Special Servicer for the Trust. Debtor does not question that, if ORIX is found from evidence to be the Special Servicer, it would have authority to litigate each of the pending issues on behalf of the Trust.

For reasons and pursuant to evidence set forth below, ORIX has indeed established that it is the Special Servicer and thus has the required standing.

**A. Procedure for Designation and Approval of the Special Servicer under the Pooling and Servicing Agreement**

The Note and Mortgage evidencing Debtor's indebtedness is owned by the Trust. (ORIX ex. 20, 66.) The Trust was created by a Pooling and Servicing Agreement dated as of November 1, 2003. That Agreement authorizes the Special Servicer, without any further authority from the Trustee under the Agreement, to take enforcement actions with respect to collateral on defaulted mortgage loans. (*See* ORIX ex. 67, at 108, 139–43.) This alone is generally sufficient to allow a Special Servicer to proceed as the real party in interest in these contested matters. *See CWCapital Asset Mgmt., LLC v. Chi. Props., LLC*, 610 F.3d 497, 499–502 (7th Cir. 2010). In this case, however, ORIX also introduced into evidence a Limited Power of Attorney in which the Trust granted ORIX the authority needed to pursue actions as the real party in interest. (ORIX ex. 70.)

Under the Agreement, the "Majority Certificateholder" of the "Controlling Class" is authorized to designate a new Special Servicer. (ORIX ex. 67, at 189.) The "Majority Certificateholder" is

> [w]ith respect to any specified Class of Classes of Certificates, as of any date of determination, any Holder or particular group of Holders of Certificates of such Class or Classes, as the case may be, entitled to a majority of the Voting Rights allocated to such Class or Classes, as the case may be.

(*Id.* at 58.) The "Controlling Class" is

> [a]s of any date of determination, the outstanding Class of Sequential Pay Certificates with the *lowest Payment Priority* (the Class A Certificates being treated as a single Class for this purpose) that has a then outstanding Class Principal Balance at least equal to 25% of the Initial Class Principal Balance thereof (or, if not Class of Sequential Pay Certificates has a Class Principal Balance at least equal to 25% of the Initial Class Principal Balance thereof, then the "Controlling Class" shall be the outstanding Class of Sequential Pay Certificates with the then largest outstanding Class

Principal Balance).

(*Id.* at 41 (emphasis supplied).)

To designate a new Special Servicer, the Majority Certificateholder must send a written notice to the Trustee, who *must* approve the new Special Servicer. (*Id.* at 189.) Once that happens, the designee becomes the Special Servicer after the Trustee receives (1) written confirmation from the ratings agencies that the designation will not cause the Trust's ratings to go down, (2) written acceptance by the designee, and (3) an Opinion of Counsel that the designee will be bound by the Agreement. (*Id.* at 189–90.) Once the designee becomes the Special Servicer, the Trustee is required to give notice of the designation to all certificateholders. (*Id.* at 249.)

**B. ORIX Became the Special Servicer**

ORIX showed that it was the Majority Certificateholder of the Controlling Class of the Trust, and that it properly became the Special Servicer under terms of the Agreement. ORIX has thus produced evidence to support a finding that it is the Special Servicer.

Midland Loan Services, Inc., was the original Special Servicer under the Agreement. (*Id.* at 83.) However, at some point, ORIX bought into the Trust. At trial, John Sanborn, ORIX's representative, testified as follows on direct examination:

> Q. Now, the investors in the trust that we talked about a minute ago, are they known as certificate holders?
> A. Yes, sir.
>
> Q. And is ORIX a certificate holder having a minority percentage of certificates in the trust?
> A. Yes, we are. They are called tranches of securitizations, and *we have the lowest tranche of the securitization.* So we have the highest risk.

(Tr. vol. 2, Nov. 23, 2010, at 14:12–21 (emphasis added).) Amy Howell, in-house counsel for ORIX, also testified that ORIX held 65% of the certificates in the lowest tranche. That evidence was not rebutted. ORIX therefore owned the majority of certificates in the lowest tranche of certificates, the lowest tranche having highest risk under the Agreement. (ORIX ex. 67, at 41, 58.) ORIX was thus the "Majority Certificateholder" of the highest risk class which was the "Controlling Class" as earlier defined. ORIX was thereby authorized to designate a new Special Servicer.

The next question is whether ORIX properly designated itself as Special Servicer. ORIX did not introduce into evidence any notice it sent to the Trustee, any written confirmations by ratings agencies sent to the Trustee, any written acceptance by it to serve as Special Servicer, or any Opinion of Counsel that ORIX would be bound by the Agreement. Still, Amy Howell, in-house counsel for ORIX, testified in response to questions by Debtor's counsel that these documents do exist and that they were executed concurrently with ORIX's purchase of certificates in the Trust. Also, ORIX did introduce the Notice of Special Servicing Transfer, which the Trustee sent to certificateholders to inform them that ORIX had appointed itself as Special Servicer. (ORIX ex. 69.) The Trustee was not authorized to send that Notice unless satisfied that the appointment procedures had been complied with. (*See* ORIX ex. 67, at 249.) The Trustee's authority to send that notice was not questioned at trial and must therefore be presumed to have been properly exercised. Therefore, that evidence is sufficient to show that ORIX became the Special Servicer as required under the Agreement. Since Debtor neither showed the Trustee's authority to have been improperly exercised nor showed that any other party is the Special Servicer, its contest on grounds of standing has no merit.

Because ORIX became the Special Servicer under the Agreement, it has the necessary authority under the Agreement and standing to contest the pending issues.

## II. DEBTOR'S PROPERTY IS VALUED AT $23,600,000

On motion of any party in interest and after a hearing on notice, "[t]he court may determine the value of a claim secured by a lien on property in which the estate has an interest." Fed. R. Bankr. P. 3012. In this case, ORIX and Debtor each presented an appraiser who gave an expert opinion as to value of Debtor's property on which ORIX asserts a lien.

ORIX's expert appraiser opined that the value of Debtor's property was $20.9 million using the sales-comparison and income-capitalization approaches, but principally relying on the latter approach. Debtor's appraiser used the same evaluation methods, but arrived instead at a value of $53.6 million. Neither appraiser's opinion was completely acceptable, so the ultimate finding of value must be based on weight given to parts of each expert's opinion.

First, the market has not supported Debtor's asserted value. Debtor has been marketing the entire property at a price close to its appraiser's value, but no buyers have expressed interest and no lenders have offered to refinance the debt owed to the Trust. Robert McBroom, an expert on the manufactured housing industry, also testified that buyers had expressed disbelief over Debtor's high asking price.

Second, for the sales-comparison approach, ORIX's appraiser was more credible. He used properties located in the Midwest: three in Illinois, two in Michigan, one in Indiana, and one in Kentucky. In contrast, Debtor's appraiser used only one property from Illinois, the remaining properties coming from either California or Washington. Using properties from the West Coast, which has a much different real estate market than that in the Chicago area, cannot be fully

credited. In doing so, Debtor's appraiser weakened his ultimate opinion of value.

Third, the ORIX expert calculated possible expenses to be used in his calculation though those expenses were not actually incurred. Forth, the experts differed as to whether actual income collected should be used in valuations, or whether rents charged should be used whether or not actually collected.

The opinions given by experts offered by ORIX and Debtor can be summarized as follows:

|  | **ORIX's Expert** | **Debtor's Expert** |
|---|---|---|
| Effective Gross Income of the Subject Property | $4,024,200 | $5,180,344 |
| Expenses* | $1,615,085 | $1,427,810 |
| Net Operating Income | $2,409,115 | $3,752,537 |
| Capitalization Rate | 11.5% | 7.0% |
| **Rounded Value Indication** | $20,900,000 | $53,600,000 |

*Includes reserve for replacement.

The income figures used by ORIX's appraiser were more credible. He based his opinion on the actual rents collected by Debtor, not on the rents due and charged whether or not collected. Debtor's expert relied on the latter figure. Testimony by McBroom, the expert on the manufactured housing industry, was that buyers of manufactured home communities would consider actual rents collected and not rents merely billed but not collected. That testimony corroborated the analysis of ORIX's expert and is persuasive here. Therefore, it is found that the actual rent collected as reflected on Debtor's operating reports, $3,847,882, is the Effective Gross Income to be used to determine value of Debtor's property.

As to expenses, Debtor's expert was more credible. ORIX's expert cited possible road,

infrastructure, and sewer issues, which might give rise to expenses in the future; those accounted for most of the difference between the two experts' calculations of expenses. However, those possible expenses were not documented by hard evidence showing needs and possible costs. Therefore, the actual documented expenses used in the report of Debtor's expert, $1,427,810, is found to constitute Debtor's expenses.

The capitalization rate used by each expert must be questioned. ORIX's expert presented evidence that the industry average capitalization rate for manufactured home communities is 10.25%. He then increased the capitalization rate for Debtor's property to 11.5% based on his judgment, referring to possible infrastructure, environmental, and crime issues. However, the assumptions that such issues existed were inferred from sketchy testimony, not based on hard evidence; they cannot persuasively justify an increase in the capitalization rate used.

Debtor's expert chose a capitalization rate of 7% based on industry average rates for the apartment market. However, evidence showed that use of a rate for apartment buildings is not appropriate here, where there is a more specific rate available for manufactured home communities. Therefore, the average capitalization rate for manufactured home communities, 10.25%, is found to be appropriate to the property involved.

Using the values determined above, Debtor's net income is $2,420,072. Dividing this amount by the capitalization rate of 10.25% results in a rounded value of $23,600,000. Therefore, it is found and held that Debtor's property is valued at $23,600,000. A separate order will be entered to that effect.

## III. ORIX IS ENTITLED TO RELIEF FROM STAY

A party in interest may seek relief from the automatic stay on certain grounds. *See* 11

U.S.C. § 362(d). In any hearing on a motion for relief from stay, the party requesting relief has the burden of proof on the issue of the debtor's equity in property, while the party opposing relief has the burden of proof on all other issues. 11 U.S.C. § 362(g).

**A. The Trust's Interest in Debtor's Property Is Not Adequately Protected**

A party in interest may seek relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1). Adequate protection is intended "only to assure that a secured creditor, during the pendency of a bankruptcy case, does not suffer a loss in the value of its interest in the property of the bankruptcy estate." *In re Markos Gurnee P'ship*, 252 B.R. 712, 716 (Bankr. N.D. Ill. 1997) (citing *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988)). "[I]f a creditor is threatened with a decline in the value of its interest in the estate's property, the estate must take action to make up the decline, either through cash payments or liens on other property, or through some other method that provides the 'indubitable equivalent' of the creditor's interest." *Markos Gurnee P'ship*, 252 B.R. at 716; *accord* 11 U.S.C. § 361 (listing methods of providing adequate protection). If, however, the value of the creditor's interest is not declining, then the creditor is not entitled to adequate protection. *See Markos Gurnee P'ship*, 252 B.R. at 716.

It is clear that Debtor's property has declined in value since the bankruptcy case was filed, even if the amount of such decline is in dispute. As discussed above, the value of Debtor's property is now $23.6 million. This shows a decline in value since the bankruptcy case was filed on May 17, 2010, using either party's pre-bankruptcy appraisal. (ORIX's, dated March 15, 2010, was for $35 million; Debtor's, dated April 9, 2010, was for $62.3 million.) In light of the

troubled nature of the property in issue and especially its vacancy rate of 76% as of October 6, 2010, (ORIX ex. 14) there is little reason to conclude that the decline in value has ended. Therefore, it must be determined whether or not the Trust is adequately protected.

Debtor maintains that the Trust is adequately protected because Debtor has made periodic cash payments, placed real estate taxes in escrow, and maintained appropriate insurance. Debtor also argues that a significant equity cushion provides adequate protection to ORIX. However, as discussed herein, there is no equity cushion. Maintaining real estate tax escrow and paying insurance premiums do protect against some potential loss in value, but they do not prevent the sort of loss seen in this case, which is attributable to the loss of tenants and decline in actual rent collected. Debtor has been making periodic cash payments as required in single asset real estate cases. *See* 11 U.S.C. § 362(d)(3)(B). However, even if those payments could in some situations qualify as adequate protection payments, they are not sufficient to provide adequate protection for value loss in this case. Using the lowest pre-bankruptcy valuation, an appraisal provided by ORIX dated March 15, 2010, the value of Debtor's property has declined at a rate of approximately $1.4 million per month. Debtor's current monthly interest payments of approximately $155,000 are inadequate to protect the Trust's interest in Debtor's property against such a large rate of decline in value.

### B. Even if the Trust Was Adequately Protected, Debtor Has No Equity in its Property and the Property Is Not Necessary for Effective Reorganization

A party interest may also seek relief from the automatic stay if "(A) the debtor does not have any equity in such property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(1).

"[I]t is the burden of the *debtor* to establish that the collateral at issue is 'necessary to an effective reorganization.'" *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375 (1988) (emphasis in original) (citing 11 U.S.C. § 362(g)). "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*." *Id.* at 375–76 (emphasis in original). "This means . . . that there must be a reasonable possibility of a successful reorganization within a reasonable time." *Id.* at 376 (internal quotation marks and citation omitted).

Here, Debtor has no equity in its property: ORIX's claim is approximately $36 million (ORIX ex. 29), while the value of Debtor's property is only $23.6 million. Therefore, the only question is whether there is a realistic plan in prospect.

Debtor introduced into evidence an initial proposed Chapter 11 Plan (Debtor ex. 3) and later filed an amended Chapter 11 Plan [Docket No. 161]. Debtor has not obtained any new financing. Instead, both Plans proposed to stretch out payments on the Trust's loan, paying only interest for a period (three years in the original Plan, four years in the amended Plan), followed by principal and interest payments for a period (forty-seven months in the original Plan, twenty-three months in the amended Plan), with a balloon payment upon completion of the Plan. Both also propose full payment of unsecured claims and retention of interest by Debtor's sole managing member. However, both plans assume that the Trust is fully secured, which is not the case. The Trust has a has an unsecured claim of approximately $12.4 million in excess of the property value, giving it a controlling vote in the unsecured class of claims. Neither Plan accounts for this. Moreover, the class of unsecured claims is impaired, while under each

proposed Plan the Members of the Debtor LLC retain their interests. Debtor's Plans do not explain how this possible violation of the absolute priority rule, 11 U.S.C. § 1129(b)(2)(B), could be approved over ORIX's objection. Because of these factual weaknesses and legal problems, it cannot be said that Debtor has a realistic reorganization plan in prospect.

Because Debtor has no equity in its property and no plan is in prospect, and because the Trust's interest in Debtor's property is not adequately protected, ORIX's Motion for Relief from Stay will be granted by separate order.

## IV. DEBTOR CANNOT USE CASH COLLATERAL BECAUSE THE TRUST IS NOT ADEQUATELY PROTECTED

A debtor-in-possession may not use cash collateral unless the secured creditor consents or the court approves the use. 11 U.S.C. §§ 363(c)(2), 1107. After final hearing, on a contested motion to use cash collateral, the use of cash collateral will be permitted, prohibited, or conditioned as is necessary to provide adequate protection of the creditor's interest. *Id.* § 363(e). The debtor-in-possession bears the burden of proof on the issue of adequate protection and the secured creditor bears the burden of proof on the issue of the validity, priority, or extent of its interest. *Id.* § 363(p). A creditor whose collateral is depreciating in value is not adequately protected. *Timbers*, 484 U.S. at 370.

Debtor's cash income is part of the security for debt owed to the Trust, thus constituting cash collateral that Debtor may not use without providing adequate protection of the Trust's interest. While the amount of cash in Debtor's accounts has risen dramatically from $11,126 to $545,703 over the course of the case, that increase is attributable to the fact that Debtor is not servicing its secured debt. The Trust's interest still must be adequately protected to the extent

Debtor proposes to use that and other cash.

Several interim agreed orders have been entered granting ORIX replacement liens and superpriority administrative claims as adequate protection. (*E.g.*, Stipulation and Interim Order [Docket No. 174].) However, Debtor has not specified in its written post-trial argument how adequate protection will be provided going forward. In its motion to use cash collateral, Debtor proposed only to permit ORIX to inspect books and records, to maintain insurance, to provide ORIX evidence with of the cash collateral, and to maintain the manufactured home community in good repair. These clearly do not provide the "indubitable equivalent" of the Trust's lien on the cash collateral as required under 11 U.S.C. § 361, especially given the evidence that occupancy is declining and rents are not being collected at stated rates.

Because Debtor has not shown how the Trust will be adequately protected, Debtor's motion for use of cash collateral will be denied by separate order.

## CONCLUSION

For reasons discussed above, by separate orders, Debtor's property will be valued at $23,600,000, ORIX's Motion for Relief from Stay will be granted, and Debtor's Motion for Use of Cash Collateral will be denied.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this ___ day of January, 2011.