IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| STERLING ESTATES (DELAWARE), LLC, | ) | Bankruptcy No. 10 B 22319 |
| | ) | |
| Debtor. | ) | |

**OPINION DENYING DEBTOR'S MOTION TO ALTER
OR AMEND JUDGMENTS, OR IN THE ALTERNATIVE,
TO GRANT STAY AND FOR OTHER RELIEF [Docket No. 240]**

Debtor owns and operates a manufactured home community, a park consisting of pre-manufactured homes placed on individual sites or "pads" that are leased out to customers. On May 17, 2010, it filed for bankruptcy under Chapter 11. Debtor is indebted under a promissory note (the "Note") held by Banc of America Commercial Mortgage Inc., Commercial Mortgage Pass-Through Certificates, Series 2003-2 (the "Trust"). Wells Fargo Bank, N.A., is Trustee for the registered holders of the Trust (the "Trustee"). ORIX Capital Markets, LLC, ("ORIX") has demonstrated its authority to litigate the pending contested matters as Special Servicer, a representative of the Trustee. The Note matured on May 1, 2010, and is secured by a lien on substantially all of Debtor's property, including Debtor's real estate, rents, a master lease, and a management agreement. According to ORIX's Proof of Claim, Debtor owes $36,933,867 in principal and interest on the Note.

Evidence was taken and trial held on (1) Debtor's Motion for Use of Cash Collateral and ORIX's Objection thereto, (2) ORIX's Motion for Relief from Stay, and (3) ORIX's Motion to Value Property. Final argument and authority were filed in writing by the parties. Following trial,

on January 6, 2011, Findings of Fact and Conclusions of Law [Docket No. 236] (the "Findings and Conclusions") were made and entered addressing all three motions. That same date, orders were entered denying use of cash collateral [Docket No. 239], granting relief from the stay [Docket No. 238], and valuing Debtor's real estate at $23,600,000 [Docket No. 237] (collectively, the "Orders").

Debtor now moves to alter or amend the Orders or, alternatively, for a stay pending appeal. Debtor attaches to its Motion and Supplement certain documents consisting of Letters of Intent pertaining to possible interest in purchasing Debtor's property, now argued to be relevant evidence of value that is higher than the value found. One existed prior to close of the evidence hearing but was not offered then, and others were obtained afterwards. Debtor has not moved to reopen the hearing so as to offer those or other evidence, but merely appends the exhibits for sake of argument and argues they should be considered as if they were evidence.

## I. DEBTOR'S MOTION TO ALTER OR AMEND WILL BE DENIED BECAUSE IT DOES NOT PRESENT EVIDENCE OF VALUE OR SHOW ANY ERROR OF LAW OR FACT

A party may file a motion to alter or amend a judgment within fourteen days after entry of the judgment. Fed. R. Bankr. P. 9023 (applying Fed. R. Civ. P. 59(e) in bankruptcy). A court may grant the motion "if the movant presents newly discovered evidence that was not available at the time of trial or if the movant points to evidence in the record that clearly establishes a manifest error of law or fact." *In re Prince*, 85 F.3d 314, 324 (7th Cir. 1996).

Debtor argues that its motion should be granted both because it has newly discovered evidence to present and because the Findings and Conclusions contained several "manifest errors of law or fact."

### A. The Letters of Intent Do Not Justify Altering or Amending the Orders Because the Letters Are Either Not "Newly Discovered" or Not Evidence of Value or Evidence at All

Any newly discovered evidence that a movant presents must have been unavailable to the movant at the time of the hearing. *Prince*, 85 F.3d at 324. "A Rule 59(e) motion cannot be used to present evidence that could and should have been presented prior to the entry of final judgment." *Retired Chi. Police Ass'n v. City of Chi.*, 76 F.3d 856, 867 (7th Cir. 1996). "Where a party is made aware that a particular issue will be relevant to its case but fails to produce readily available evidence pertaining to that issue, the party may not introduce the evidence to support a Rule 59(e) motion." *Prince*, 85 F.3d at 324.

Here, the evidence Debtor wishes to present are purported letters of intent to purchase Debtor's property.

Debtor has submitted the first letter, from Rolling Park Management, LLC, (the "Rolling Park Letter") in two versions: one with its original motion and one with its reply brief. Both versions show interest in a possible purchase price of $46.4 million, and neither has been signed by Debtor. The first version was dated December 17, 2010, and expired on January 15, 2011. The second version is dated January 21, 2011, and will expire on February 4, 2011.

Another letter, from American Housing Communities, LLC, (the "American Housing Letter") was submitted with a supplement to Debtor's reply brief. That letter is dated January 24, 2011. It shows interest in a purchase price of $40,000,000, and was not signed by Debtor.

#### *1. The December 17th Rolling Park Letter is Not "Newly Discovered" Evidence*

The December 17th Rolling Park Letter is not "newly discovered." The hearing on the three Motions was originally held on November 22 and 23, 2010. At trial, Debtor challenged for

the first time ORIX's standing to litigate the Motions. On December 16, 2010, after the parties had submitted their post-trial written argument, the parties were ordered to supply additional briefs on the issue of ORIX's standing. ORIX then moved to reopen the record to provide additional evidence on that issue. That motion was granted and a hearing was held on January 6, 2011. That same day, the Findings and Conclusions and the Orders now in issue were entered.

The December 17th Rolling Park Letter is dated after the hearing had originally concluded but before the additional hearing following reopening of evidence and entry of the Orders. Debtor could have itself moved to reopen the record, but it did not. Debtor was aware that value was an issue being litigated and had ample opportunity to present all of its evidence on that point before the Orders were entered. Because the December 17th Rolling Park Letter was in Debtor's possession before the hearing was concluded and the Orders entered, it cannot now be considered as grounds to alter or amend the Orders.

### 2. *None of the Letters Are Evidence of Value*

Unlike, the December 17th Rolling Park Letter, the January 21st Rolling Park and the American Housing Letter were not available to Debtor before the Orders were entered; therefore, they are arguably "newly discovered." However, even if the Letters are "newly discovered," they are not evidence of value that would justify altering or amending the Orders.

The Rolling Park Letter is a preliminary and conditional document that by its terms is not binding on its signatories. The prospective purchaser has not yet paid any earnest money that might signify its seriousness. Moreover, no representative of the Debtor ever signed the Letter, assertedly because Debtor's President thinks the offer is too low. No evidence is offered of the financial capability of Rolling Park to purchase. Such a preliminary and conditional document is

not material evidence.

The American Housing Letter is also conditional, expressly nonbinding, and not signed by Debtor. It is also based upon an "Offering Prospectus" prepared by Debtor's real estate broker, and could be withdrawn if Debtor's financial condition does not match the information in that document. The Prospectus itself is not in evidence and has not been offered, so its contents are unknown. However, if the financial information in the Prospectus is based upon the same inflated rental figures that formed the basis for the appraisal Debtor offered at trial, it is possible that the prospective purchaser will walk away or lower its proposed offer when it learns Debtor's true financial state. Like the Rolling Park Letter, the American Housing Letter is too contingent and uncertain to constitute evidence of value. Nor has it been accepted by Debtor.

Taken as a whole, the Letters might be viewed as evidence that market interest has been kindled for possible purchase of Debtor's property. That might be relevant to an effort by Debtor to obtain time to sell through a Motion under § 363 of the Code, but no such motion is pending. Nor has Debtor filed a liquidating plan or otherwise shown any interest in selling its property. Therefore, it is possible that the Letters are only documents created in an attempt to show property value, not even treated by Debtor as serious commercial documents.

Therefore, Debtor's Motion to Alter or Amend Judgments will be denied to the extent it relies on the newly presented Letters.

Finally, Debtor also provided an Affidavit of its President that referenced other unspecified negotiations involving undisclosed prospective purchasers and amounts. Such nebulous assertions are not evidence of value and cannot be considered grounds for altering or amending the Orders.

### *3. The Letters Are Not Evidence at All*

Evidence does not consist of waving papers in the air. It consists of entering testimony of witnesses and documents into the record pursuant to the Federal Rules of Evidence. Neither party has moved for a new trial or to reopen the record in order to present the Letters or the Prospectus. Even if they were relevant evidence of value, they could not be considered on Debtor's current motion.

Debtor is skipping over the requirement to reopen the evidence hearing so that it could offer the Letters into evidence and lay an evidentiary foundation to determine their admissibility. *See* Fed. R. Evid. 801–807 (hearsay), 901 (authentication). Documents appended to motions and briefs are not evidence. In federal court, the rules pertaining to evidence do apply. Fed. R. Evid. 101. Attaching exhibits to a brief after the evidence has closed does not qualify as evidence.

### B. Debtor Has Not Shown Any Manifest Errors of Law or Fact

An error that would be grounds for granting a motion to alter or amend a judgment "is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (upholding district court's denial of motion to alter or amend when movant "merely took umbrage with the court's ruling and rehashed old arguments") (quoting *Sedrak v. Callahan*, 987 F.Supp. 1063, 1069 (N.D. Ill. 1997)).

Debtor asserts supposed errors that fall into five broad categories: (1) whether Debtor's property was valued correctly; (2) whether the property declined in value; (3) whether Debtor had a "plan in prospect;" (4) whether the Trust's interest in cash collateral was adequately protected; and (5) whether ORIX had standing to litigate these matters on behalf of the Trust.

*1. Valuation Method*

Debtor's first issue concerns the valuation set forth in the Findings and Conclusions. Debtor complains that, because the rents collected are currently depressed compared to what Debtor might ideally obtain, the valuation reflects a liquidation value and not a going concern value, thereby ignoring the purpose of the valuation that was conducted. *See* 11 U.S.C. § 506(a) (value "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property"). Debtor is incorrect. The valuation set forth in the Findings and Conclusions reflects the value of Debtor's business as it is operating today. It was not a liquidation, or forced sale, value. Nor can valuation be, as Debtor would have it, based on speculative projections of what the property may be worth in the future should rents increase and the property is "stabilized."

Each of the factors considered in the finding as to valuation reflected Debtor's existing business. The net operating income figure that was used reflected Debtor's actual income and expenses. Consideration of historical or speculative future income is inappropriate to determine current going concern value.

The capitalization rate used in the ruling (an "average" rate of 10.25%) was found in the report of ORIX's expert. (ORIX ex. 2, at 58–62.) That rate reflects the most recent evidence of capitalization rates for sales of manufactured home communities in the current real estate market, and is corroborated by several sources outlined in the report of ORIX's expert. First, a published investor survey from RealtyRates.com indicated that the low, average, and high capitalization rates for manufactured housing communities in the second quarter of 2010 were 6.46%, 10.25%, and 15.9%, respectively. (*Id.* at 59.) Second, the capitalization rates for sales of other

manufactured home communities ranged from 5.14% to 8.27%.[1] (*Id.* at 58.) However, those properties had better occupancy rates, and therefore, better income than Debtor's property. Because Debtor's property is more risky, a higher capitalization rate was necessary. Further, ORIX's expert also surveyed industry professionals on the relevant capitalization rate for the type of property included here: Rick Jebb estimated a rate ranging from 0.5% to 12.5%; Bob McBroom estimated rates of 9% to 12%, and Michael Olsen and Ed Zeman estimated rates of 10% or more. (*Id.* at 60.) This evidence and the risk shown by Debtor's low and declining occupancy rates supported the finding that 10.25% was the appropriate capitalization rate.

Debtor did not present at trial evidence that strongly supported its preferred lower capitalization rate of 7%. Debtor's expert first looked to comparable sales to determine an appropriate capitalization rate. (Debtor ex. 5 (Sept. Appraisal), at 77.) Most of Debtor's proposed comparable sales were on the West Coast, a different real estate market altogether. As for the comparable sale in Illinois, Whippletree Village, the purchaser assumed preexisting financing, which increased value and lowered the risk of that property. That is not likely an option available to Debtor here. Debtor's expert also relied on a published investor survey of capitalization rates in the apartment market. (*Id.* at 77–79.) Regardless of any similarities between manufactured home communities and apartment complexes, Debtor's survey on apartment complex capitalization rates cannot be relied on when ORIX has provided a more specific survey for manufactured home communities. Last, Debtor's expert relied on historical capitalization rates

---

[1] ORIX's expert also treated as a comparable sale a manufactured home community located in Urbana, Illinois, that is merely listed for sale. While that property was listed for sale recently, in September 2010, has a similar occupancy rate to Debtor, and supposedly has a capitalization rate of 10.55%, it was not considered in the Findings and Conclusions and is not considered here because that property does not represent an actual market transaction.

for manufactured home communities. (*Id.* at 78.) However, that information cannot be relied on given the investor survey provided by the ORIX expert showing current capitalization rates.

Debtor also complains that the value determined in the Findings and Conclusions did not take into account the relative quality of its property when compared to other manufactured home communities. However, whatever qualitative advantages the Debtor's property has are relevant only to the extent they serve to attract quality tenants who are willing to pay rent. A luxurious clubhouse is just that and nothing more unless people are willing to pay rent in order to have access to it. But Debtor's occupancy rate reflects a failure of that and other possible attributes to attract enough tenants.

Debtor also finds error in the asserted lack of sales comparison analysis in the Findings and Conclusions. Debtor argues that the value indicated under the income-capitalization approach should have been reconciled to the purchases prices of other sales listed in the appraisals of the parties' experts. However, as discussed above, Debtor's proposed comparable sales were in fact not fully comparable to Debtor's property. Moreover, all of the properties listed by Debtor and ORIX in the appraisals presented reflect higher occupancy rates and lower capitalization rates than Debtor's property, indicating that they presented less risk to their purchasers than Debtor's property would.

### 2. *Declining Value*

Debtor next asserted supposed errors concern the finding that Debtor's property has declined in value since the bankruptcy case was filed. The burden on that issue was on Debtor. *See* 11 U.S.C. §§ 362(g), 363(p) (on issue of adequate protection, burden is placed on debtor). There was certainly evidence to support the finding that Debtor's property declined in value after

this bankruptcy case was filed. Both parties provided appraisals dated prior to the bankruptcy filing, each of which was higher than the parties' respective post-bankruptcy appraisals. (*Compare* Debtor ex. 5 (pre-bankruptcy: $62.3–67.9 million) *and* ORIX ex. 3 (pre-bankruptcy: $35 million) *with* Debtor ex. 5 (post-bankruptcy: $53.6 million) *and* ORIX ex. 2 (post-bankruptcy: $20.9 million).) Thus, the appraisals offered by both parties demonstrated that the property declined in value after the bankruptcy filing.

ORIX also presented evidence showing Debtor's declining occupancy rate during the pendency of the case. Debtor quibbles with the use of the term "vacancy rate" in the Findings and Conclusions. However, it is clear from that discussion that the relevant data showed what portions of potentially rentable pads were occupied, regardless of the term applied. Since paying tenants are the source of Debtor's income and cash flow is the basis for valuing Debtor's property, the value of Debtor's property has clearly declined as the occupancy rate declined. The evidence showed that in months leading up to Debtor's bankruptcy, from January 1, 2010, to May 1, 2010, the occupancy rate fell from 91% to 81%, and that it fell even further after the bankruptcy filing to 76% by October 6, 2010.

Therefore, the evidence did show that a significant portion of the decline in value occurred after the bankruptcy filing, and Debtor has not shown grounds to alter or amend the Orders on this issue.

### *3. Debtor's Plan*

Debtor next complains that it was a mistake to find that Debtor had no plan in prospect. Before addressing each of Debtor's asserted errors on this point, it must be noted that this was an alternative finding. ORIX's motion for stay relief was granted on two grounds: first, because the

Trust's interest in Debtor's property was not adequately protected and, alternatively, because Debtor had no equity in the property and had no plan in prospect.

That point aside, Debtor's arguments as to the plan issues lack merit. Debtor contends that it should have been permitted to amend its plan to address the concerns raised in the Findings and Conclusions. However, the standard for whether a debtor has a "plan in prospect" is not whether it might conceivably craft a plan in the future that might allow it to reorganize. Rather, it is whether, at the time the stay relief motion is decided, there is a "reasonable possibility of a successful reorganization within a reasonable time." *See United Sav. Ass'n v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 375 (1988).

Debtor has thus far proposed two plans, but the evidence does not demonstrate that it will be able to reorganize under either plan within a reasonable time. Aside from potential issues of absolute priority and the effect of ORIX's likely dissent on Debtor's ability to confirm a plan, Debtor has not demonstrated that it has an economically feasible plan. *See* 11 U.S.C. § 1129(a)(11) (plan can be confirmed only if "not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor"). In its latest filed Plan, Debtor proposes to put the Trust's claim on hold, paying only interest for four years, followed by slightly higher payments of principal and interest for just under two years, followed by a large balloon payment of the remaining balance. Debtor does not specify where it will obtain the funds to pay the remaining balance, which is certain to be substantial. The Plan does not provide for sale under the Plan or for a sale under 11 U.S.C. § 363. It must be speculated that Debtor intends to refinance the debt. Given the declining value of Debtor's property and the difficulty Debtor is having retaining tenants and collecting rents, it cannot now be said that such a refinancing would

be likely in six years. In the face of evidence received, Debtor's Plan is entirely speculative and is therefore not feasible. Therefore, Debtor has not demonstrated that it has a "likely" possibility of a successful reorganization as required by § 1129(a)(11), and on this issue it did not show grounds for altering or amending the Orders.

Debtor argues that it might be able to offer some other unspecified plan if given a chance. However, courts must deal with what is on the table at time of ruling. Debtor cannot argue that what they might have proposed should be treated as if they had proposed it even if they did not.

### *4. Adequate Protection and Cash Collateral*

Next, Debtor points to two asserted errors regarding the lack of adequate protection of the Trust's interest in Debtor's cash collateral. First, Debtor complains of supposedly conflicting findings that (1) Debtor's cash reserves had increased because it is not "servicing" its debt and (2) Debtor is making monthly interest payments. "Servicing" is a term that sometimes is used to include payment of interest only, and debtor was paying interest. However, it is clear from the discussion in the Findings and Conclusions on this issue that the cash reserves were increasing because Debtor was not repaying principal on its debt to the Trust, even if it was to some extent "servicing" the debt through interest-only payments.

Second, Debtor complains of the finding that it had not specified in its post-trial briefs how adequate protection could be provided to the Trust going forward. Debtor argues that it should be given an opportunity "to review the Court's and ORIX's concerns on this matter and fashion an acceptable response." Debtor had the burden at trial to demonstrate that the Trust's interest in cash collateral was adequately protected. It did not meet that burden. It is clear that the interest-only payments being made cannot constitute adequate protection in light of the large

decrease in property value post-bankruptcy and the decline in tenants.

Debtor does not even at this late stage in its motion to alter or amend the Orders attempt to offer protection to the creditor's interest. It opts instead only to ask for further opportunity to do so. Debtor's failure to meet its burden earlier cannot be grounds for altering or amending the Orders.

### 5. ORIX's Standing

Finally, Debtor complains about assertedly erroneous findings related to ORIX's standing. First, it argues that conflicting findings were made. Not so. Amy Howell, in-house counsel for ORIX, testified that ORIX held 65% of the certificates in the lowest tranche of the Trust. This testimony was entirely consistent with the earlier testimony of John Sanborn, ORIX's representative at trial, that ORIX held all the certificates in lowest tranche of the Trust. Sanborn also testified that those certificates represented a minority of all the certificates in all the tranches of the Trust, but that is not relevant to whether ORIX was the Majority Certificateholder of the Controlling Class (the lowest tranche). Several documents that might have further supported this testimony and other evidence were not produced, but that does not matter. Through the testimony and documents in evidence as discussed in the Findings and Conclusions, including the designation of ORIX by the Trust as its authorized representative, ORIX more than met its burden to show standing.

Debtor also faults the Findings and Conclusions for not relying on *ORIX Capital Markets, LLC v. La Villita Motor Inns, J.V.*, No. 04-09-00573-CV, 2010 WL 3331702 (Tex. App. Aug. 25, 2010). There are several problems with that argument. First, *La Villita*, a Texas state-court case, is not binding here. Second, *La Villita* addressed a different pooling and servicing

-13-

agreement than the one in this case, with terms that may not exactly match the terms of the Agreement here. *See id.* at *2. Third, the opinion in *La Villita* merely describes how ORIX elected to prove its authority to litigate in that case. *Id.* at *6–9. It does not hold that ORIX's chosen method there was the *only* way to prove a servicer's authority. *Id.*

Because Debtor has not demonstrated any error of law or fact, its motion to alter or amend the Orders will be denied by separate order.

## II. DEBTOR'S MOTION FOR STAY PENDING APPEAL CANNOT BE CONSIDERED BECAUSE NO APPEAL IS PENDING

Debtor also seeks a stay of the Orders pending appeal should its motion to alter or amend the Orders be denied. However, no party has filed a notice of appeal in this case relating to any of the Orders. Therefore, Debtor's motion is premature and will be dismissed without prejudice to Debtor seeking the same relief under Rules 7062 and 8005 Fed. R. Bankr. P. should it decide to appeal any of the Orders.

## CONCLUSION

For reasons stated above and by separate orders to be entered, Debtor's Motion to Alter or Amend Judgments will be denied, and its alternative Motion for Stay Pending Appeal will be dismissed as premature.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this ____ day of February, 2011.